# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

FREDERICK HERMAN FISHER,

       Plaintiff,

v.                                                            Case No. 03-CV-71804-DT

PATRICIA CARUSO,

       Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S
## "MOTION FOR SUMMARY JUDGMENT" AND DENYING
## PLAINTIFF'S "MOTION FOR SUMMARY JUDGMENT . . ."

Pending before the court are cross motions for summary judgment. Defendant Patricia Caruso ("Defendant"),[1] Director of the Michigan Department of Corrections ("MDOC"), filed a "Motion for Summary Judgment" on February 28, 2006. Plaintiff Fredrick Herman Fisher ("Plaintiff") filed a *pro se* "Motion for Summary Judgment, or [to] Set This Cause of Action for Trial"[2] on March 1, 2006.[3] Having reviewed the motions and supporting briefs, the court concludes that a hearing is unnecessary. *See* E.D.

---

[1] Defendant Patricia Caruso is the current Director of MDOC, having replaced former Director William Overton ("Overton"), who was named as a Defendant in the original complaint. Defendant Caruso was originally sued in her capacity as Deputy Director of MDOC as well as in her individual capacity, although she was later dismissed as a Defendant in each of those capacities. The court later ordered Defendant Caruso substituted for Overton on August 15, 2005, after she replaced Overton as Director.

[2] The court notes that a motion is not necessary to set the cause of action for trial. In due course, litigation that withstands summary judgment is automatically scheduled by the court for trial.

[3] While Plaintiff captioned his March 21, 2006 filing as a "Motion in Opposition to . . . Defendant's Motion for Summary Judgment," the court interprets the filing as a response brief rather than as a motion and will cite to it as such.

Mich. LR 7.1(e)(2).  For the reasons stated below, both motions will be denied.

## I.  BACKGROUND

Plaintiff Fisher is a 68 year-old prisoner, who has been confined by the State of Michigan since 2001.  (Fisher Dep. at 4, Def.'s Mot. at Ex. B; Def.'s Mot. Br. at 3.) Plaintiff initiated this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 in May 2003, originally naming as Defendants ten employees of MDOC in their official and individual capacities.[4]  Plaintiff alleges that Defendant Caruso, in her capacity as Director of MDOC, was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment protection against cruel and unusual punishment, failing to take appropriate measures to prevent Plaintiff's exposure to environmental tobacco smoke ("ETS") (also known as secondhand smoke).[5]  (Pl.'s Mot. at 1.)  Accordingly, Plaintiff claims that MDOC's non-smoking policy has been significantly under-enforced in prison facilities and that prisoners continue to smoke freely indoors; he also testified that he believes MDOC's non-smoking policy cannot properly be enforced at current prison staffing levels.  (Fisher Dep. at 70, Def.'s Mot.  at Ex. B.)

Plaintiff suffers from numerous medical conditions, including respiratory diseases.[6]  (*See* Pl.'s Mot. at Ex. 1.)  Medical reports submitted by Plaintiff indicate that, in January 2002, Plaintiff had chronic obstructive pulmonary disease ("COPD"), also

---

[4] As explained below, Plaintiff's remaining claim is against only Defendant Caruso.

[5] The court will use these terms interchangeably.

[6] Plaintiff informed a physician in 1999 that, although he was a non-smoker for the previous ten years, he had smoked more than one pack of cigarettes per day for at least forty years before quitting.  (Physician Notes at 1, Def.'s Mot. at Ex. A.)

2

described as "chronic lung disease," (*id.* at Ex. 6), and in August 2003, Plaintiff was taken to an Emergency Room by ambulance after exhibiting symptoms of "moderate respiratory distress," during which time he was diagnosed with "exacerbation of [COPD]," (*id.* at Ex. 7).[7]  Contrary to Defendant's assertion that Plaintiff was found to "have no limitation regarding his respiratory condition" in 2002 (*see* Def.'s Mot. at 4), a June 19, 2002 medical screening report described Plaintiff as being "independent[ly]" limited with respect to respiratory disease as well as cardiac and circulatory conditions. (Def.'s Mot. at Ex. C.)

On at least four occasions, MDOC radiologists diagnosed Plaintiff's condition as COPD: December 2003; January 5, 2004; January 28, 2004; and February 14, 2005. (Pl.'s Mot. at Exs. 8-11.)  A March 7, 2005 report from the MDOC Pulmonary-MSP Chronic Care Clinic ("Clinic") stated that both of Plaintiff's lungs were "not clear," and that he had "diminished breath sounds" and "wheezes" on both sides.  (*Id.* at Ex. 13.) The same report also labels "Obstruction, Chronic Airway" and "Asthma" as unresolved diagnoses of Plaintiff since October 16, 2002, indicating that "severe persistent asthma"

---

[7] Medical reports also indicate that Plaintiff suffered from acute chronic obstructive pulmonary disease ("COPD") and acute bronchitis in August 2000 (Pl.'s Mot. at Ex. 1).  Plaintiff also had a history of emphysema and, in August 2000, suffered from chronic bronchitis and asthmatic bronchitis (*id.* at Ex. 2).  These diagnoses were made prior to Plaintiff's incarceration, ostensibly by Plaintiff's private physician, and there appears to be no evidence in the record that Plaintiff submitted these records to Defendant, prior to attaching them to his March 1, 2006 Response Brief.  The September 5, 2000 Report, again completed by Plaintiff's private physician, states: "[Plaintiff] is strictly urged to stay away from secondary smoke.  I did tell him that this is even worse at times then [sic] smoking yourself."  (*Id.* at Ex. 3.)

and COPD were "poor[ly]" controlled and had "worsened." (*Id.* at Ex. 14.)[8]  Plaintiff was

diagnosed in April 2003 with "Keratopathy, Bullous," a vision disorder. (*Id.*)  The Clinic

ordered that Plaintiff be assigned to a bottom bunk starting December 1, 2003 and to a

ground floor room starting October 6, 2004.[9]  (*Id.* at Ex. 16.)  The Clinic also ordered on

March 7, 2005 that Plaintiff be housed in the Tobacco-free Unit. (*Id.* at Ex. 15.)

        In 1998, MDOC adopted a smoke-free policy for Michigan prison facilities,

including prisoner housing units.  (MDOC Policy Directive 01.03.140 at 1, Def.'s Mot. at

Ex. D. at 5.)  The policy, however, does not prohibit smoking more than "100 feet [from

a public] entrance to a Department occupied building" nor more than "20 feet from all

other entrances." (*Id.*)  Due to the legality of smoking outside in certain places,

prisoners are generally allowed to possess "smoking paraphernalia authorized for

purchase from the prisoner store" except in certain designated medical spaces. (*Id.*)

        Plaintiff testified that, at the beginning of his incarceration in September 2001, he

did not require special medical accommodations relating to secondhand smoke.  (Fisher

Dep. at 18-19.)  Plaintiff began serving his prison sentence at MDOC's Reception and

Guidance Center ("RGC") followed by a term at the State Prison of Southern Michigan

in Jackson, Michigan ("SMI").  (Def.'s Mot. at 3.)  Plaintiff testified that he "didn't have

any problems [at SMI] because he had a single man cell." (Fisher Dep. at 18, Def.'s

---

        [8]Secondhand smoke can "worsen existing pulmonary symptoms for people with
asthma and chronic bronchitis, as well as for people with allergic conditions.  Even
individuals who are not allergic can suffer eye irritation, sore throat, nausea, and
hoarseness."  (National Cancer Institute Report at 5, Pl.'s Resp. Br. at Ex. 5.)

        [9] Plaintiff, however, testified that he was assigned a bunk bed on the ground floor
as early as 2001 due to his age and arthritis.  (Fisher Dep. at 19, Def.'s Mot. at Ex. B.)

Mot. at Ex. B.)

Plaintiff was transferred from SMI to Southern Michigan Correctional Facility ("JMF") in Jackson, Michigan on December 17, 2001. (*Id.* at 20.) Plaintiff testified that problems associated with secondhand smoke began when he was first assigned to JMF.[10] (*Id.* at 20-21.) Plaintiff testified that, during his time at JMF, he wrote several letters to MDOC officials complaining about secondhand smoke at JMF in violation of the non-smoking policy. (*Id.* at 22.) Alleged recipients included Defendant, who was Deputy Director of MDOC at the time, as well as Overton, who was Director of MDOC at the time. (*Id.*) Plaintiff further testified that his letters went unanswered. (*Id.*) Pursuant to MDOC prisoner complaint procedures, Plaintiff began a three-step grievance process on December 12, 2002. (Pl.'s Resp. Br. at Ex. 11 at 10.) Defendant testified that, prior to May 28, 2003, "prisoners who complained of second hand tobacco smoke had their grievances rejected, as the issue was considered to affect a significant number of prisoners." (Caruso Aff. at 2, Pl.'s Resp. Br. at Ex. 1.) Consistent with this policy, Plaintiff's grievance and subsequent appeals were denied at each step. (Pl.'s Resp. Br. at Ex. 11.) On Plaintiff's Step I grievance form, which was later denied, he states that Plaintiff "sent letters to William Overton, Director" of MDOC, indicating the letter-writing was part of his November 2002 attempts to resolve the situation. (*Id.*) In denying Plaintiff's Step II Grievance, Sherry Burt, Warden of JMF, cited to MDOC's non-smoking policy and indicated that "[s]taff will continue to monitor and enforce this policy." (Pl.'s

---

[10] Plaintiff does not appear to have formally complained to prison officials about secondhand smoke until late 2002. (Def.'s Mot. at Ex. C.) Neither Plaintiff's special needs identification screening sheet nor his prisoner's grievance forms list any respiration problems or secondhand smoke complaint before this time. (*Id.*)

5

Resp. Br. at Ex. 11 at 8.)  An MDOC investigator denied Plaintiff's final, or Step III,

grievance appeal on February 28, 2003.  (*Id.* at 1.)      Warden Burt testified that Plaintiff

purchased tobacco products valued $99.90 from JMF's prison commissary, according to

receipts dated December 26, 2001 to November 19, 2002 that purportedly document

purchases of tobacco by Plaintiff.  (Burt Aff. at 3, Def.'s Mot. at Ex. D.)  Plaintiff

acknowledged that he bought tobacco on one occasion in 2002, but testified that he

bought it to trade with another inmate.  (Fisher Dep. at 70-72, Def.'s Mot. at Ex. B.)

      During part of 2003, Plaintiff was housed at the Parnall Correctional Facility

("SMT") located in Jackson, Michigan.[11]  (Def.'s Mot. at 5.)  SMT's Assistant Deputy

Warden testified that, during an Air Quality test in 2003, an MDOC inspector identified

no problems of ventilation and determined that ventilation capacity was sufficient.

(Skipper Aff. at 2, Def.'s Mot. at Ex. F.)

      Plaintiff was transferred back to MBP in October 2003 in order to "make room for

incoming prisoners."  (Mize Aff. at 3, Def.'s Mot. at Ex. E.)  The 2003 Annual Sanitation

Inspection Report for MBP indicates that "[a] review of ventilation test and balance

reports was conducted and air vents in representative prisoner sleeping areas . . . were

tested" and in compliance.  (Kirkwood Aff. at 8, Def.'s Mot. at Ex. G.)  Plaintiff was

transferred back to JMF on November 19, 2003.  (Mize Aff. at 3., Def.'s Mot. at Ex. E.)

---

      [11] The parties dispute the duration of Plaintiff's housing at SMT in 2003.
Defendant characterizes the period as constituting "most of 2003" (Def.'s Mot. at 5
(citing Mize Aff. at 3, Def.'s Ex. E)), though the court notes the absence of any indication
in the record of the date of Plaintiff's arrival at SMT, which documents only the October
28, 2003 date of his transfer from SMT to MBP (Mize Aff. at 3, Def.'s Ex. E).
Conversely, Plaintiff alleges that he has been "[r]etaliatory [sic] transferred" to SMT
twice, both times spending less than 35 days there (Pl.'s Resp. at 5), though he offers
no evidence in support of this assertion.

On January 7, 2004, Plaintiff was transferred to the G. Robert Cotton Correctional Facility ("JCF") located in Jackson.  (*Id.*)  Christopher Langley, Acting Administrative Assistant to the Warden of JCF, stated that prison staff issued 763 "minor misconducts" from January to August 2004 for violations of the rules prohibiting smoking in Department buildings.  (Langley Aff. at 3, Def.'s Mot. at Ex. K.)  Langley further averred that an Annual Inspection Report in March 2005, seven months after Plaintiff's transfer to another facility, deemed Indoor Air Quality at JCF as "compliant." (*Id.* at 2-3.)

Plaintiff was transferred back to SMT on August 12, 2004 in light of threats made "by unknown prisoners at JCF" towards Plaintiff.  (Mize Aff. at 3, Def.'s Mot. at Ex. E.) In September 2004, Plaintiff was transferred three times: first to the Gus Harrison Correctional Facility ("ATF") due to the "closing of Wing Barracks at SMT"; then to the Parr Highway Correctional Facility ("ARF"); and lastly back to JMF to facilitate "long term protection" of Plaintiff.  (*Id.*)  Inspection reports deemed air quality at ARF in 2004 and 2005 as "[c]ompliant."  (Webb Aff. at 2, Def.'s Mot. at Ex. L.)  According to MDOC Classification Director Edward Mize ("Mize"), Plaintiff was transferred to Lakeland Correctional Facility ("LCF") in February 2005 to facilitate "protection," and was transferred to Muskegon Correctional Facility ("MCF") in March 2005 because Plaintiff felt he was "in danger at this facility."  (Mize Aff. at 3, Def.'s Mot. at Ex. E.)  The report of an annual inspection in July 2005 concluded that LCF's Indoor Air Quality was "compliant."  (Lyon Aff. at 4, Def.'s Mot. at Ex. M.)

Gregery Ferqueron, an MDOC inmate who was allegedly housed at MCF at the

7

same time as Plaintiff,[12] stated: "I have been forced to breath[e] contaminated second

hand Tobacco smoke inside of every Prison Facility that I have been Transferred to,

and that all of my transfers were because I wrote Grievances, or complained to [sic]

much about Smoker's [sic]."  (Ferqueron Aff. at 1, Pl.'s Resp. Br. at Ex. 10.)  Ferqueron

further averred that

> [t]he Air in all Correctional Facility Cells . . . [is] Totally Contaminated with
> Environmental Tobacco Smoke, [and that] This Second Hand Tobacco
> Smoke comes through the Ventilation System to all Cells, So even if an
> Inmate/Prisoner was in a Single Cell, he would still have to Breath[e]
> second hand smoke.  There is [no] Possible way to get away from the
> second hand tobacco smoke.

(*Id.*)  Ferqueron indicated that he was assigned to what was supposed to be a Tobacco-

free Unit at MCF, but that "this so called Tobacco-free Unit has at least 75 smokers

living in it."  (*Id.* (capitalization altered)).

Inmate Bennie Williams, also allegedly housed at MCF at the same time as

Plaintiff, claimed that he was assigned to the Tobacco-free Unit but that he was a

smoker and that he did smoke in the Tobacco-free Unit.  (Williams Aff. at 1, Pl.'s Resp.

Br. at Ex. 10.)  Williams further stated that he had asked repeatedly to move from the

Tobacco-free Unit so he could "smoke at will as all of the other inmate's [sic] do in those

units," but that his requests were not heeded.  (*Id.*)

Plaintiff was relocated several more times in December 2005 and January 2006

in order to "transfer [him] to his true security level" and to accommodate a medical

appointment.  (Mize Aff. at 3, Def.'s Mot. at Ex. E.)  As of February 2006, Plaintiff was

---

[12] Ferqueron testified that he was transferred to MCF on August 4, 2005.
(Ferqueron Aff. at 1, Pl.'s Resp. Br. at Ex. 10.)

confined at the Cooper Street Correctional Facility in Jackson, Michigan ("JCS").  (Def.'s Mot. at 1.)

Prison records indicate that Plaintiff, after initiating this lawsuit, was transferred between facilities on at least eleven occasions.  (Mize Aff. at 2-3, Def.'s Mot. at Ex. E.) Plaintiff alleges that MDOC subjected him to "retaliatory transfers," causing him to be housed with smokers or to reside in secondhand smoke environments as a result of his complaints.  (Pl.'s Resp. Br. at 2; Fisher Dep. at 24-25, Def.'s Mot. at Ex. B.)  Mize testified that Plaintiff was transferred in accordance with MDOC policies and "not . . . as a means of exacting punishment for his filing complaints at any MDOC facility or because of any pending litigation."  (Mize Aff. at 4, Def.'s Mot. at Ex. E.)  The transfer records specify administrative and medical reasons for Plaintiff's transfers, but did not indicate that alleviating Plaintiff's exposure to secondhand smoke was a factor in any of the transfers.  (*See id.* at 2-3.)  In contrast, Plaintiff testified, in support of his allegations, that before his move to JCS an unnamed lieutenant said to him, "You raise too much hell around here with your grievances and writing -- and writing too many letters to too many people.  We're tired of you here and that's why you're being moved." (Fisher Dep. at 24-25, Def.'s Mot. at Ex. B.)

In his original Complaint, Plaintiff sought compensatory and punitive damages against ten MDOC employees and requested a temporary restraining order preventing the sale of tobacco products at all state prison facilities.  (Compl. ¶ IV.)  This court adopted Magistrate Judge Wallace Capel, Jr.'s October 8, 2003 report and recommendation [Dkt. #37] and entered judgment dismissing Plaintiff's claims without prejudice on November 26, 2003, citing Plaintiff's failure to exhaust administrative

9

remedies with respect to some of the named Defendants, as well as his failure to state a

claim [Dkt. #49].

Plaintiff filed an appeal on December 24, 2003.  The Sixth Circuit affirmed this

court's order in part, reversed in part, and remanded for further proceedings.  *Fisher v.

Overton*, 124 F. App'x 325, 328 (6th Cir. 2005).  Specifically, the Sixth Circuit affirmed

this court's dismissal of nine Defendants, based on Plaintiff's failure to exhaust

administrative remedies, and affirmed the dismissal of the damages claim against

Overton.  *Id.*  The Sixth Circuit also affirmed the dismissal of claims against Overton in

his individual capacity.  *Id.*  The Sixth Circuit reversed, however, the dismissal of

Plaintiff's claim for injunctive relief against Overton in his official capacity.  *Id.*  On

remand, Overton filed a "Motion to Dismiss and/or for Summary Judgment" on May 9,

2005.  The court granted in part Defendant's motion, dismissing Plaintiff's state law

claims and conspiracy claim, but denying Defendant's motion to dismiss Plaintiff's claim

for injunctive relief against Defendant Caruso in her official capacity.[13]  *Fisher v.

Overton*, No. 03-71804, 2005 WL 1982925, at *4 (E.D. Mich. Aug. 15, 2005).

Defendant filed a "Motion for Summary Judgment" on February 28, 2006.

Plaintiff filed a "Motion for Summary Judgment . . ." on March 1, 2006.[14]

_____

[13] Subsequent to Overton's filing of the motion to dismiss, but before the court acted upon the motion, Defendant Caruso was substituted for Overton.  (8/15/05 Order.)

[14] Despite the reference in Plaintiff's summary judgment motion to a "Motion for Appointment of Counsel that this Court has [h]eld in [a]beyance" (*see* Pl.'s Mot. at 4), the court does not believe that there is a motion to appoint counsel pending.  Plaintiff filed a "Motion for Appointment of Counsel" on May 23, 2003.  Magistrate Judge Capel ordered this motion held in abeyance on October 8, 2003, pending this court's action on the Magistrate's report and recommendation.  This court and the Sixth Circuit subsequently took further action, as previously described, notably without referring to the Plaintiff's motion.  On remand, Plaintiff filed a second "Motion for the Appointment of

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material facts for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require a submission to a jury."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment -- the disputed factual issue must be material.  *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict - 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" (alteration in original)).  A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party.  *Kendall v. Hoover*

---

Counsel" on May 5, 2005, which the court interpreted as supplanting the original motion, even if the May 23, 2003 motion had survived the intermediate proceedings.  The court denied the May 5, 2005 motion on May 26, 2005.  (5/26/05 Order.)

*Co.,* 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party.[15] *Dunigan v. Noble*, 390 F.3d 486, 492 (6th Cir. 2004) ("[W]e must determine 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed.'" (citation omitted)).  The court does not weigh the evidence to determine the truth of the matter but to determine if the evidence produces a genuine issue for trial.  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

## III.  DISCUSSION

Defendant presents three arguments in support of her motion.  First, Defendant argues that Plaintiff has failed to establish his claim of deliberate indifference against Defendant under the Eighth Amendment.  (Def.'s Mot. at 8-13.)  Second, Defendant argues that Plaintiff's request for an injunction banning smoking in Michigan prison housing should be denied because such extraordinary relief is not warranted.  (*Id.* at 17.)  Third, Defendant argues that she is entitled to qualified immunity because a failure to transfer Plaintiff to smoke-free housing is not objectively unreasonable when there is, she alleges, no medical directive present.  (*Id.* at 13-17.)

Plaintiff, in his cross motion, alleges that Defendant was deliberately indifferent to his health and welfare.  (Pl.'s Mot. at 1.)  Accordingly, Plaintiff requests that the court

---

[15] In cross motions for summary judgment, the court must view the facts in the light most favorable to each party, in turn, as it addresses their respective motions.

grant a permanent injunction returning him to MCF's level two smoke-free unit.  (Pl.'s

Mot. at 3.)  Further, Plaintiff requests that the injunction restrain MDOC from transferring

him to another prison -- and, he argues, thereby rendering his grievance moot -- as a

retaliation if Plaintiff should file an ETS-related grievance in the future.  (*Id.*)

Additionally, Plaintiff asks this court to order Defendant to reimburse Plaintiff for his

legal costs, including filing fees, appeal fees and other costs.  *(Id.)*  Plaintiff moves, in

the alternative, for a jury trial to resolve all outstanding claims.[16]  (*Id.* at 4.)

---

[16] Federal Rule of Civil Procedure 38(b) provides that "[a]ny party may demand a
trial by jury of any issue triable of right by a jury by . . . serving upon the other parties a
demand therefor in writing . . . not later than 10 days after the service of the last
pleading directed to such issue."  Fed. R. Civ. P. 38(b).  "The failure of a party to serve
and file a demand as required by this rule constitutes a waiver by the party of a trial by
jury."  Fed. R. Civ. P. 38(d).  Since Plaintiff failed to make a jury demand within the ten-
day period afforded him under the rules, which expired in 2003, the court finds that
Plaintiff has waived his right to a jury trial.  *See Preferred Rx, Inc. v. Amer. Prescription
Plan, Inc.*, 46 F.3d 535, 548 (6th Cir. 1995) ("The right to trial by jury even though
grounded in . . . federal . . . constitutional protections is a right subject to waiver).
Although Plaintiff waived his right to a jury trial, Rule 39(b) allows parties to seek relief
from such a waiver.  *See* Fed. R. Civ. P. 39(b); *Orlowski v. TRW, Inc.*, 765 F. Supp.
1277, 1277 (6th Cir. 1991).  Even if the court construes Plaintiff's one sentence request
for a jury trial (*see* Pl.'s Mot. at 4) as a Rule 39(b) motion, the court is still unpersuaded
that it should exercise its discretion to grant a jury trial, three years after the litigation
commenced.  *See Kitchen v. Chippewa Valley*, 825 F.2d 1004, 1013 (6th Cir. 1987)
(affirming district court's grant of jury trial in light of claimed "inadvertent" failure to
demand a jury, but indicating that the district court's actions were "somewhat
unorthodox.").  While the Sixth Circuit has held that in considering a Rule 39(b) motion,
the court's discretion "should be exercised in favor of granting a jury trial in the absence
of strong and compelling reasons to the contrary," the Sixth Circuit also held that the
court does not "abuse its discretion by denying a 39(b) motion if the only justification for
delay is mere inadvertence."  *Id.*  Plaintiff has offered no justification or explanation for
his request for a jury at this late stage, leading the court to conclude that inadvertence
or mistake may have been responsible for the failure to demand a jury in a timely
fashion.  *See id.* (indicating that the Ninth and Second Circuits have held that a 39(b)
motion must be denied if the only reason for the delay was mistake or inadvertence).
Accordingly, insofar as Plaintiff may have moved for a jury trial, the court denies the
motion.

## A.  Plaintiff's Eighth Amendment Claim

To prevail on a claim under 42 U.S.C. § 1983, Plaintiff must demonstrate that (1) he was deprived of a right secured by the Constitution or laws of the United States, (2) the deprivation was caused by a person acting under color of state law, and (3) the deprivation occurred without due process of the law.  *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir. 1994).

In ruling on Defendant's motion, the court, viewing the facts in a light most favorable to Plaintiff, must first determine whether Plaintiff has established that Defendant's conduct violated Plaintiff's constitutional rights.  *See O'Brien*, 23 F.3d at 995.  Plaintiff alleges that Defendant violated the Eighth Amendment's proscription of cruel and unusual punishment.  (Pl.'s Mot. at 1.)  Specifically, Plaintiff alleges that Defendant acted with deliberate indifference to Plaintiff's serious medical needs by failing to take appropriate measures to prevent Plaintiff's exposure to secondhand smoke.  (Pl.'s Resp. Br. at 1-2.)

The Eighth Amendment provides that "cruel and unusual punishments [shall not] be inflicted."  U.S. Const. Amend. VIII.  The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotations and citations omitted).

Though state action is required for most constitutional claims, the Sixth Circuit has held that in the prison context, "an omission often *is* state action."  *Spencer v. Bouchard*, 449 F.3d 721, 730 (6th Cir. 2006).  Accordingly, "a prisoner's Eighth Amendment claim may be based on a 'prison official's act or *omission*.'"  *Id.* (citing

14

*Farmer*, 511 U.S. at 834 (emphasis added)).

However, "[t]he Eighth Amendment does not apply to every deprivation, or even every unnecessary deprivation, suffered by a prisoner, but only that narrow class of deprivations involving 'serious' injury inflicted by prison officials acting with a culpable state of mind." *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (quoting *Hudson v. McMillian*, 503 U.S. 1, 20 (1992)). "[A] prison official cannot be found liable under the Eighth Amendment for denying a prisoner humane conditions of confinement unless the official knows of and disregards an *excessive* risk to inmate health or safety . . . ." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (emphasis added)).

A claim based on deliberate indifference to a prisoner's serious medical needs under the Eighth Amendment consists of two components: one objective and one subjective. *Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006) (citing *Farmer*, 511 U.S. at 834); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). "To satisfy the objective component, the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Comstock*, 273 F.3d at 702 (*citing Farmer*, 511 U.S. at 834). "A claimant may satisfy the subjective prong of this inquiry by establishing that 'the official knows of and disregards an excessive risk to inmate health or safety,' which is to say 'the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Clark-Murphy*, 439 F.3d at 286 (citing *Farmer*, 511 U.S. at 837).

The Supreme Court has held that a prisoner "states a cause of action under the Eighth Amendment by alleging that . . . [prison officials] have exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health." *Helling*,

15

509 U.S. at 35.  The Sixth Circuit has held that "prisoners have a right not to be exposed to environmental smoke that presents a serious risk to health and to be removed from places where smoke hovers."  *Reilly v. Grayson*, 310 F.3d 519, 521 (6th Cir. 2002) (internal quotations omitted) (*"Reilly I"*), *aff'g Reilly v. Grayson*, 157 F. Supp. 2d 762 (E.D. Mich. 2001) ("*Reilly II*").  "The case law establishes beyond any doubt that, in particular circumstances, a prison inmate's Eighth Amendment right to be free from cruel and unusual punishment is violated because of his/her placement in a smoke-filled environment."  *Reilly II*, 157 F. Supp. 2d at 770.[17]

### 1.  The Objective Component of Plaintiff's Eighth Amendment Claim

The court finds that a reasonable fact finder could determine that Plaintiff has satisfied the objective component of his Eighth Amendment claim, demonstrating that his medical need is "sufficiently serious."  *See Comstock*, 273 F.3d at 702-03 (citing *Farmer*, 511 U.S. at 834).  Specifically, Plaintiff must establish that he has a serious medical need for a smoke-free environment or that, regardless of his health, the level of secondhand smoke in the prison creates an unreasonable risk of serious damage to his future health.  *Reilly II*, 157 F. Supp. 2d at 771; *see Helling v. McKinney*, 509 U.S. 25, 35 (1993).  "A medical need is 'serious,' . . . if it is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily

---

[17] Although the district court's opinion in *Reilly II* is merely persuasive authority, the Sixth Circuit indicated in *Reilly I* that it "affirm[ed] on the basis of the district court's opinion in [*Reilly II*]," and that it affirmed "the judgment of the district court upon the reasoning set out by that court in [*Reilly II*]."  *Reilly I*, 310 F.3d at 520-21 ("Because the reasons why judgment should be entered for the plaintiff have been fully articulated by the district court, the issuance of a detailed opinion by this court would be duplicative and would serve no useful purpose.")  Accordingly, throughout this opinion, the court, pursuant to *Reilly I*, treats *Reilly II* as controlling precedent.

recognize the necessity for a doctor's attention.'" *Reilly II*, 157 F. Supp. 2d at 772 (citing

*Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 334 (3rd Cir. 1987)).

With respect to the objective component, the Supreme Court has held that

> determining whether [a prisoner's] conditions of confinement violate the
> Eighth Amendment requires more than a scientific and statistical inquiry
> into the seriousness of the potential harm and the likelihood that such
> injury to health will actually be caused by exposure to ETS.  It also
> requires a court to assess whether society considers the risk that the
> prisoner complains of to be so grave that it violates contemporary
> standards of decency to expose *anyone* unwillingly to such a risk.  In other
> words, the prisoner must show that the risk of which he complains is not
> one that today's society chooses to tolerate.

*Helling*, 509 U.S. at 35.

The Sixth Circuit has previously affirmed an award of damages to an inmate

suffering from asthma in light of MDOC's continued failure to place him in a smoke-free

environment.  *Reilly I*, 310 F.3d at 520-21.  Providing the basis for that award, a judge in

this District determined that "shortness of breath and difficulty in breathing represent a

risk of serious damage to health, especially since the symptoms increase in severity

over time, particularly when exposed to ETS."  *Reilly II*, 157 F. Supp. 2d. at 769.

The court believes that Plaintiff has presented evidence from which a reasonable

fact finder could conclude that he has a serious medical need for a smoke-free

environment.  *See Comstock*, 273 F.3d at 702.  Plaintiff has presented significant

evidence that he suffers from respiratory conditions "sufficiently serious" to necessitate

that he avoid secondhand smoke in order to prevent more serious harm.  *See id.*

Plaintiff has been repeatedly diagnosed with COPD and asthma, as well as bullous

keratopathy.  (Pl.'s Mot. at Ex. 14.)  While the fact finder might conclude that Plaintiff's

"at least forty years" of smoking contributed to his respiratory conditions (*see* Physician

17

Notes at 1, Def.'s Mot. at Ex. A), the court is unwilling to rule as a matter of law that Plaintiff's prior tobacco use prevents a finding that secondhand smoke could seriously worsen Plaintiff's medical condition.  Plaintiff submitted evidence that his private physician "strictly urged [him] to stay away from secondary smoke" as early as 2000. (Pl.'s Mot. at Ex. 3.)  Moreover, MDOC's medical staff determined in 2005 that Plaintiff should be housed in a Tobacco-free Unit.  (Pl.'s Mot. Br at Ex. 15.)  There is no evidence in the record that this medical directive has been altered since its issuance.

The court believes that a reasonable fact finder could conclude that the risk of which Plaintiff complains -- continuous exposure to secondhand smoke in light of serious respiratory conditions -- satisfies the *Helling* test, being so grave a risk that it violates contemporary standards of decency to expose anyone to it unwillingly.  *See Helling*, 509 U.S. at 35.

Accordingly, the court finds that a reasonable fact finder could conclude that Plaintiff satisfies the Eighth Amendment objective component.  *See Talal v.* White, 403 F.3d 423, 427 (6th Cir. 2005) (concluding, in light of medical documentation establishing that smoke caused the plaintiff sinus problems and dizziness, coupled with a medical recommendation that plaintiff be placed in a non-smoking unit, that the plaintiff had a medical condition which satisfied the Eighth Amendment objective component); *Comstock*, 273 F.3d at 702.

18

### 2.  The Subjective Component of Plaintiff's Eighth Amendment Claim

In addition to satisfying the objective component of the Eighth Amendment standard, Plaintiff must allege facts that would show that Defendant[18] subjectively perceived facts from which she could infer a substantial risk of exposing Plaintiff to secondhand smoke, that Defendant did in fact draw such an inference, and that Defendant disregarded the risk.  *See Farmer*, 511 U.S. at 837; *Reilly II*, 157 F. Supp. 2d at 771.  Consequently, it is not enough that an official failed to alleviate a significant risk that she should have perceived but did not.  *Farmer*, 511 U.S. at 838.  Eighth Amendment liability requires "more than a lack of due care for the prisoner's interests and safety."  *Id.* at 835.  Plaintiff, on the other hand, does not have to show that the prison official acted "for the very purpose of causing harm or with knowledge that harm will result."  *Id.* at 835.  The Supreme Court has characterized "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner" as "the equivalent of recklessly disregarding that risk."  *Id.* at 836.  However, the Supreme Court noted that a prison official may "not escape liability if the evidence show[s] that [s]he merely refused to verify underlying facts that [s]he strongly suspected to be true,

---

[18] Although Defendant Caruso, as the current Director of MDOC, is the nominal defendant, the court notes that a suit against a public officer in her official capacity is effectively brought against the office she holds as opposed to the individual.  *See* Fed. R. Civ. P. 25(d)(1) (stating that an "officer's successor is automatically substituted as a party).  As previously noted, Defendant was substituted for Overton after she succeeded to the MDOC Office of Director.  (8/15/05 Order.)  Consequently, acts of Defendant's predecessor during the relevant period will be viewed as acts of the Director of MDOC, and knowledge attributable to Director Overton shall be imputed to Defendant.  *See* Fed. R. Civ. P. 25(d)(2) ("A public officer who sues or is sued in an official capacity may be described as a party by the officer's official title rather than by name.").

or declined to confirm inferences of risk that [s]he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n.8; *Comstock*, 273 F.3d at 703.

To survive summary judgment, an inmate "seeking an injunction on the ground that there is a contemporary violation of a nature likely to continue must . . . come forward with evidence from which it can be inferred that the [defendant-official was] at the time the suit was filed, and [is] at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so." *Hadix v. Johnson*, 367 F.3d 513, 526 (6th Cir. 2004) (citing *Farmer*, 511 U.S. at 845-46). Further, the Supreme Court has held that the subjective factor should be "determined in light of the prison authorities' current attitudes and conduct," their "attitudes and conduct at the time the suit is brought and persisting thereafter." *Farmer*, 511 U.S. at 845 (internal quotations and citation omitted).

Plaintiff contends that "[t]here is no possible way that [Defendant] Caruso does not know that Plaintiff is in dire need to protect his health and welfare and that Defendant Caruso knows this and has known this for at least four years." (Pl.'s Resp. Br. at 1-2 (citing Caruso Aff. at 1, Pl.'s Resp. Br. at Ex. 1 (describing Defendant's various administrative positions with MDOC) and referencing Plaintiff's alleged sixteen grievances to MDOC officials alleging smoke-filled facilities)).

Plaintiff's testimony that he sent letters concerning his health problems and second-hand smoke to former Director Overton and current Director Caruso in 2002, (*see* Fisher Dep. at 22, Def.'s Mot. at Ex. B.), is sufficient to establish a genuine issue of material fact with respect to whether Defendant subjectively perceived facts at the time of the litigation from which she could infer a substantial risk of exposing Plaintiff to

secondhand smoke and whether she did in fact draw such an inference.  *See Farmer*, 511 U.S. at 837; *Reilly II*, 157 F. Supp. 2d at 771.  Even if Plaintiff's alleged correspondence about his medical condition alone would not have fully convinced Defendant, Defendant cannot escape liability if the evidence shows that she "merely refused to verify underlying facts that [s]he strongly suspected to be true, or declined to confirm inferences of risk that [s]he strongly suspected to exist."  *See Farmer*, 511 U.S. at 843 n.8.  Accordingly, the court finds that a reasonable fact finder could conclude that Defendant subjectively perceived facts at the time the litigation commenced from which she could infer a substantial risk of exposing Plaintiff to secondhand smoke and that she did in fact draw such an inference.

If the fact finder did conclude that Plaintiff satisfied the objective prong of the Eighth Amendment test by showing the existence of an objectively unconstitutional act at the time the summary judgment motion was made, that same fact finder would reasonably be able to conclude that the subjective prong was also satisfied at the time of summary judgment.  *See Farmer*, 511 U.S. at 847 n.9 ("If, for example, the evidence before a district court establishes that an inmate faces an objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness, any more than prison officials who state during the litigation that they will not take reasonable measures to abate an intolerable risk of which they are aware could claim to be subjectively blameless for purposes of the Eighth Amendment, and in deciding whether an inmate has established a continuing constitutional violation a district court may take such developments into account."); *Hadix,* 367 F.3d at 526 ("If [the prison] conditions are found to be objectively unconstitutional, then that finding would also

satisfy the subjective prong because the same information was available to the prison officials.")  Since this litigation has been ongoing for over three years, the court believes a reasonable fact finder could conclude that Defendant is aware of the key facts in the record, including the Clinic's March 2005 order that Plaintiff be placed in a Tobacco-free Unit, as well as Plaintiff's medical records describing respiratory and visual disorders. (Def.'s Mot. at Exs. 14-15.)

Beyond the inquiry into Defendant's knowledge and inferences, the court must consider whether a reasonable fact finder could conclude that Defendant "unreasonably disregard[ed] an objectively intolerable risk of harm, and . . . will continue to do so . . . ." *Hadix*, 367 F.3d at 526.  The Supreme Court has held that the adoption of a non-smoking policy will "bear heavily on the inquiry into deliberate indifference."  *Helling*, 509 U.S. at 36 (noting that the realities of prison administration would appropriately be considered in evaluating this factor).  In 1998, former MDOC Director Kenneth McGinnis approved a smoke-free policy for Michigan prison facilities, including prisoner housing units.  (MDOC Policy Directive 01.03.140 at 1, Def.'s Ex. D. at 5.)  This policy provides that supervisors receiving a complaint of a violation of the policy shall "investigate and take action to resolve the issue at the lowest level possible," as soon as possible.  (*Id.* at 2.)  The policy states that "[t]he right of the nonsmoker to protect his/her health and comfort will prevail over an employee's or prisoner's desire to smoke."  (*Id.*)  Defendant testified that "[t]he department continues to review procedures regarding the implementation of Policy Directive 01.03.140," and that the process for handling prisoner complaints has been modified so that "[s]taff are being instructed to look at each individual prisoner's complaint to see how the complaint affects that prisoner."

22

(Caruso Aff. at 2, Pl.'s Resp. Br. at Ex. 1.)

Although it does not appear that Defendant invokes "supervisory liability" case law, Defendant claims that "Plaintiff provides no evidence whatsoever that any medical personnel spoke with or wrote to Defendant Caruso regarding Plaintiff's medical conditions." (Def.'s Mot. at 13.)  "Supervisory liability [under 42 U.S.C. § 1983] attaches when a supervisor encourages or condones a constitutional violation."  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 314 (6th Cir. 2005).  "The liability must be based upon active unconstitutional behavior," not just "a mere right to control employees and cannot be based upon simple negligence."  *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999).  Although the record does not reflect any personal involvement of Defendant in Plaintiff's medical care or housing assignment, the court believes that a reasonable fact finder could conclude that MDOC's policy of denying all grievances before 2003 (*see* Caruso Aff. at 2, Pl.'s Resp. Br. at Ex. 1) was approved by Defendant.  The fact finder could also conclude that Plaintiff's attempts to contact Defendant were necessitated by effectively denying the grievance process to prisoners in his position.  As such, the court believes that Plaintiff has provided sufficient evidence of an act or omission to act by the Office of Director of MDOC that a reasonable fact finder could conclude that "supervisory liability" requirements will not bar his claim.  *See Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999).

Defendant also cites to MDOC's non-smoking policy, arguing that the prison officials' alleged good faith efforts to enforce the policy prevent Plaintiff from proving a claim of deliberate indifference.  (Def.'s Mot. at 12.)  In the context of Defendant's specific knowledge of Plaintiff's medical conditions, however, a policy alone may not be

enough.  *See Reilly II*, 157 F. Supp. 2d at 771 ("[W]hereas a generalized risk of future harm may reasonably and perhaps only be addressed by implementation of an anti-smoking policy, existing serious medical needs are susceptible to and may reasonably require more specific action.") (quoting *McIntyre v. Robinson*, 126 F. Supp. 2d 394 (D. Md. 2000)).  For example, "[a] prison official presented with a doctor's note indisputably diagnosing an inmate with a heart condition and recommending that he be provided with a nonsmoking cellmate could not reasonably ignore the recommendation in reliance on an anti-smoking policy."  *Id.* at 771.

Defendant cites to an unpublished[19] Sixth Circuit case, *Green v. Martin*, 18 F. App'x 298, 300 (6th Cir. 2001) (quoting *Scott v. District of Columbia*, 139 F.3d 940, 944 (D.C. Cir. 1998)), for the proposition that "[i]mperfect enforcement of [a non-smoking] policy by defendants does not equate to deliberate indifference on their part."  (Def.'s Mot. at 12.)  The Sixth Circuit has quoted *Scott* in a series of unpublished cases subsequent to *Green*.  *See, e.g.*, *Wilson v. Hofbauer,* 113 F. App'x 651, 653 (6th Cir. 2004); *Taylor v. Boot*, 58 F. App'x 125, 127 (6th Cir. 2003).  Plaintiff's allegations are distinguishable from *Scott,* where the court cited a number of steps taken by the defendant prison officials to demonstrate that the non-smoking policy was adhered to. *See Scott*, 139 F.3d at 944.  The *Scott* court stated:

---

[19] Unpublished decisions in the Sixth Circuit are not binding precedent, *Sheets v. Moore*, 97 F.3d 164, 167 (6th Cir. 1996) (holding that unpublished opinions "carry no precedential weight [and] . . . have no binding effect on anyone other than the parties to the action"), but their reasoning may be "instructive" or helpful, *Combs v. Int'l Ins. Co.,* 354 F.3d 568, 593 (6th Cir. 2004) ("Willits v. Peabody Coal Co., 188 F.3d 510 (6th Cir. 1999) (unpublished), is the only case to deal with the questions Plaintiff presents . . . . Although *Willits* is an unpublished opinion, its reasoning is instructive." (internal citation altered)).

> Here prison officials testified to their good-faith attempts to enforce the prison's nonsmoking policy to the best of their abilities.  A fire protection specialist found the prison in substantial compliance with nonsmoking rules during unannounced inspections.  Guards and prisoners caught ignoring or violating the nonsmoking policy were disciplined.  Steps were taken to improve ventilation in problem areas about which the prisoners complained.  Grievances and requests from inmates and prison physicians regarding exposure to tobacco smoke were answered and acted upon.  And again, actual measurements of the amount of smoke in the prison revealed that prison officials were doing a good job keeping the environment reasonably smoke-free.

*Id.*

A reasonable fact finder could conclude that Defendant failed to take steps comparable to those reported in *Scott*, aside from disciplining violators of the non-smoking policy in some cases.  *See id.*  For example, there is no evidence in the record that MDOC specifically tested compliance with the nonsmoking policy in fire protection visits, nor does there appear to be evidence that actual measurements of the amount of smoke in the prison were taken.  While the record includes multiple references to ventilation at prison facilities complying with air quality standards around the time of Plaintiff's residency, the standards and the testing appear solely to require a minimum air pressure, and not to address the quality of the air being circulated.  (S*ee, e.g.*, Skipper Aff. at 2, Def.'s Ex. F ("Required: Circulation is at least 10 cubic feet of fresh or recirculated filtered air per minute per occupant for cells/rooms.").)  The court takes judicial notice[20] that the Surgeon General has recently concluded that ventilation is

_____

[20] "[A] court may take judicial notice, whether requested or not of a 'judicially noticed fact' which 'must be one not subject to reasonable dispute,' a requirement satisfied if the fact is '(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose

insufficient to address the health risks posed by ETS.  U.S. Department of Health and

Human Services, The Health Consequences of Involuntary Exposure to Tobacco

Smoke: A Report of the Surgeon General -- Executive Summary, *available at*

http://www.surgeongeneral.gov/library/secondhandsmoke/report/executivesummary.pdf

(last visited September 21, 2006). Viewing the facts in the light most favorable to

Plaintiff, the court acknowledges the report's conclusion that "[s]eparating smokers and

nonsmokers in the same airspace is not effective, nor is air cleaning or a greater

exchange of indoor with outdoor air.  Additionally, having separately ventilated areas for

smoking may not offer a satisfactory solution to reducing . . . exposures." *Id.* at i.  The

report further concludes that "exposure to secondhand smoke remains an alarming

public health hazard." *Id.* at iii.  The court concludes that the recent Surgeon General

Report satisfies the evidentiary standard of Federal Rule of Civil Procedure 201.

Accordingly, a reasonable fact finder could conclude that housing Plaintiff in a

facility where the non-smoking policy is consistently and strictly enforced would be the

sole efficacious means to prevent a further serious risk of harm to Plaintiff.  While the

record includes testimony of Defendant and other MDOC officials to the effect that the

policy is being strictly enforced, the court believes that there is a genuine issue of

material fact with respect to whether the steps taken by Defendant to see that the policy

was enforced have been and continue to be sufficient.  MDOC officials have testified to

---

accuracy cannot reasonably be questioned.' *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 387 F.3d 468 (6th Cir. 2001) (citing Fed. R. Evid. 201).

the issuance of violations to address the problem of smoking.  For example, JMF officials issued 469 minor misconducts for violations of the rules prohibiting smoking between January 17, 2005 and February 21, 2005 (Mac Lane Aff. at 2, Def.'s Ex. J); JCF officials issued 763 minor misconducts between January and August 2004 (Webb Aff. at 3, Def.'s Ex. L); ATF officials issued 30 minor misconducts between February 25, 2005 and March 23, 2005 (Lyon Aff. at 2, Def.'s Ex. M); and SMT officials issued 229 violations in their Tobacco-free Unit between September 2003 and February 2006 (Skipper Aff. at 2, Def.'s Ex. F).  While the records of violations support a conclusion that MDOC officials were working to enforce the non-smoking policy, a reasonable fact finder could also interpret the evidence as supporting Plaintiff's allegations of widespread smoking in many of the facilities housing Plaintiff since this litigation commenced.

Plaintiff has offered evidence that several fellow inmates have attested to significant levels of smoke within MDOC facilities, including MCF during Plaintiff's confinement there in 2005.  One inmate commented, "I have been forced to breath[e] contaminated second hand Tobacco smoke inside of every Prison Facility that I have been Transferred to . . . . This so called Tobacco-free Unit has at least 75 smokers living in it."  (Ferqueron Aff. at 1, Pl.'s Resp. Br. at Ex. 10.)  He further stated that "[t]here is [no p]ossible way to get away from the second hand tobacco smoke."  (*Id.*) Another inmate asserted that he was assigned to the Tobacco-free Unit but that he was a smoker and that he did smoke in the Tobacco-free Unit, indicating that he had asked

repeatedly to move from the Tobacco-free Unit, noting that "all of the other inmate's [sic] [smoke at will] in those units."  (Williams Aff. at 1, Pl.'s Resp. Br. at Ex. 10.)  Defendants argue that such prisoner reports are insufficient to validate the levels of ETS.  (Def.'s Mot. at 10.)  However, the *Reilly* court relied in part on such testimony in ruling that a prisoner was subject to unreasonably high levels of ETS.  *See Reilly II*, 157 F. Supp. 2d at 765 ("Reilly's fellow prisoners . . . each described their confinement in the same units as Reilly at Parnell and the smoke-filled condition of each of such units.  They each testified that even though smoking was forbidden in these units, residents generally did so.").  Further, in reviewing a summary judgment motion, a "district court should not weigh the evidence or judge the credibility of witnesses."  *Spirit Airlines, Inc. V. Nw. Airlines, Inc.*, 431 F.3d 917, 959 (6th Cir. 2005) (citing *Anderson*, 477 U.S. at 255).

As noted, a reasonable fact finder could find that Defendant failed to take sufficient action to address a serious risk of secondhand smoke to Plaintiff's health and, accordingly, could determine that Plaintiff has satisfied the Eighth Amendment subjective component.

Because a reasonable fact finder could conclude that Plaintiff has established an Eighth Amendment violation, the court denies Defendant's motion for summary judgment.   However, since the court has determined that several genuine issues of material fact exist with respect to Plaintiff's claim, the court must also deny Plaintiff's motion for summary judgment.

## C.  Plaintiff's Request for a Permanent Injunction

Plaintiff requests that this court issue a permanent injunction ordering that: 1) "MDOC return Plaintiff to the Muskegon Correctional Facility [("MCF")] level two and place him in the Tobacco[-f]ree Unit (one unit)" and 2) "should Plaintiff see the need to file a prison grievance based upon the non-enforcement or passive enforcement of MDOC['s] Tobacco-[f]ree housing policy, MDOC will not retaliatory transfer Plaintiff to another prison, as a means for rendering [Plaintiff's] grievance void or redundant."  (*Id.* at 3.[21])  Defendant argues that an injunction is unwarranted, stating that no such "extraordinary relief" is appropriate.  (Def.'s Mot. at 17.)

The court is skeptical that, even if an Eighth Amendment violation is found at trial, it could grant the full extent of relief requested by Plaintiff.  Absent compelling case law to the contrary, the court would be extremely hesitant to order MDOC to house Plaintiff in a specific facility.  Even if the court had authority to enter such an order, there are myriad administrative variables to be considered in making a prisoner assignment, most of which are outside of the scope of this litigation.  Such matters fall within the expertise of MDOC and outside the usual purview of this court.  *See Farmer*, 511 U.S. at 846-47 ("[A] district court should approach issuance of injunctive orders [involving a prison] with the usual caution . . . and may, for example, exercise its discretion if appropriate by giving prison officials time to rectify the situation before issuing an injunction) (citing *Bell v. Wolfish*, 441 U.S. 520, 562 (1979) (warning courts against becoming "enmeshed in the minutiae of prison operations")).  Further, the court will not

---

[21] Defendant, in her brief, asserts that Plaintiff requests this court to ban all smoking in Michigan's prison housing unit.  (Def.'s Mot. at 17.)  Plaintiff does not seek such broad relief.  (Pl.'s Mot. at 3-4.)

prospectively forbid MDOC from transferring Plaintiff in a retaliatory manner.  Such an abuse of the penal system, if true, would be illegal, and the court concludes it is not necessary to enjoin such clearly illegal activity.

Nevertheless, the court believes that if Plaintiff demonstrates an Eighth Amendment violation at trial, it could be possible to craft some lesser injunctive remedy to vindicate Plaintiff's rights.  *See id.* at 846 ("If the court finds the Eighth Amendment's subjective and objective requirements satisfied, it may grant appropriate injunctive relief.").  Beyond this, the court will not speculate on what this remedy may be.  *See id.* at 847 n.9 ("[E]ven prison officials who had a subjectively culpable state of mind when the lawsuit was filed could prevent issuance of an injunction by proving, during the litigation, that they were no longer unreasonably disregarding an objectively intolerable risk of harm and that they would not revert to their obduracy upon cessation of the litigation.").

## B.  Defendant's Qualified Immunity Defense

Defendant argued that she should be granted qualified immunity because the failure to transfer Plaintiff to smoke-free housing was not objectively unreasonable given the alleged absence of a medical directive.[22]  (Def.'s Mot. at 13.)  Qualified immunity is an affirmative defense that must be pleaded by a defendant government official *in a suit for civil damages* based upon his official acts.  *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982); *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987).  The Supreme Court has previously extended qualified immunity to include "prison officials and officers."

---

[22] The court notes that the Clinic issued a medical directive, ordering Plaintiff placed in a Tobacco-free Unit, on March 7, 2005.  (Pl.'s Mot. at Ex. 15.)

*Procunier v. Navarette*, 98 U.S. 555, 561 (1978).

Nevertheless, "qualified immunity is ordinarily available only from damages and not from injunctive relief."  *Webster v. Sowders*, 846 F.2d 1032, 1039 n.5 (6th Cir. 1988) (citing *Wood v. Strickland*, 420 U.S. 308, 314 (1975) ("[I]mmunity from damages does not ordinarily bar equitable relief as well"); see *Harlan*, 457 U.S. at 819 n.34.  Defendant has not argued that this case falls outside the rule expressed in *Webster* and *Wood*, and the court has not discovered any applicable exceptions in its independent review of the case law.  Since Plaintiff's request for injunctive relief is the sole remaining claim, the court is convinced that qualified immunity cannot attach.  *See id.*

## IV.  CONCLUSION

IT IS ORDERED that Defendant's "Motion for Summary Judgment" [Dkt. # 102] is DENIED and Plaintiff's "Motion for Summary Judgment . . ." [Dkt. # 103] is DENIED.


 S/Robert H. Cleland                               
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  September 21, 2006

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 21, 2006, by electronic and/or ordinary mail.


 S/Lisa Wagner                                     
Case Manager and Deputy Clerk
(313) 234-5522